# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº 08-CV-01425 (JFB)

_____

RICHIE SIMMONS
*ALSO KNOWN AS* MICHAEL WASHINGTON,

Petitioner,

VERSUS

WILLIAM BROWN,
SUPERINTENDENT,
EASTERN NEW YORK CORRECTIONAL FACILITY,

Respondent.

_____

MEMORANDUM AND ORDER
May 26, 2011

_____

Joseph F. Bianco, District Judge:

Richie Simmons, also known as Michael Washington (hereinafter "Simmons" or "petitioner"), petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, to vacate his conviction for one count of Burglary in the First Degree. Simmons challenges his conviction on the following grounds: (1) he was denied effective assistance of trial counsel; and (2) his sentence was vindictive, harsh, and excessive.

Currently pending before the Court is respondent's motion to dismiss the petition as untimely, as well as respondent's opposition to the petition on the merits. For the reasons set forth below, the Court finds that the petition is untimely and that equitable tolling is unwarranted. Accordingly, the petition for a writ of habeas corpus must be dismissed as time-barred. In any event, in an abundance of caution, the Court has analyzed petitioner's claims on the merits and finds that none warrants habeas relief in this case. Accordingly, the habeas petition is denied in its entirety.

## I. BACKGROUND

### A. FACTS

The following facts were adduced from the petition and documents attached thereto, as well as from the state court trial and appellate record.

1

1. Evidence Presented by the Prosecution

The instant petition stems from petitioner's conviction, after a jury trial, of Burglary in the First Degree in violation of New York Penal Law § 140.30(4). According to the evidence presented by the prosecution at trial, at about 5:30 p.m. on May 21, 2003, petitioner and accomplice Douglas Contreras ("Contreras") arrived at 290 Dolphin Drive in Hewlett Neck, Nassau County ("the subject property") in a taxi driven by Segundo Chauca ("Chauca"). (Tr. at 554.) Contreras had previously worked at the residence. (*Id.* at 640.) Upon arrival, Contreras falsely told the housekeeper, Bibi Fazia Khan ("Khan"), that his name was "Charlie" and that he had work to do in the backyard. (*Id.* at 554-55.) Khan went into the house and called one of the homeowners, Mark Fischler ("Mr. Fischler"), to inquire about the work that "Charlie" said needed to be done. (*Id.* at 555-56.) Mr. Fischler asked to speak to "Charlie" but when Khan handed Contreras the phone, Contreras pulled out a gun and pushed Khan inside the house to the kitchen. (*Id.* at 557-58.) After grabbing a glass of water, Contreras put the gun to Khan's back and pushed her out of the kitchen. (*Id.* at 558.) Khan testified that, as she was "going out of the kitchen," she saw another man standing outside the front door. (*Id.* at 558-59.) Khan later identified that man as the petitioner. (*Id.* at 570.) Contreras then pushed Khan upstairs, where Contreras repeatedly demanded that Khan tell him where "the safe" was. (*Id.* at 559-60.) After ransacking several rooms while looking for the safe, Contreras forced Khan into the master bedroom where he tore a chain and a ring off of Khan and sexually assaulted her. (*Id.* at 560-65.)

While the assault was ongoing, Khan heard a man yell from downstairs "hurry up" and "the woman is here." (*Id.* at 565.) In addition, at some point while Contreras and

Khan were upstairs, petitioner placed several items in the back of the taxi driven by Chauca and told Chauca to wait.[1] (*Id.* at 485-86; 529-30.) These items were later determined to be a video camera, charger, and a flashlight. (*Id.* at 489-90.)

At approximately 5:50 p.m., Jacqueline Fischler, Mark Fischler's wife ("Mrs. Fischler"), returned home. (*Id.* at 642.) When she pulled into the driveway, she saw a black Lincoln Town Car pull out of her driveway and speed away. (*Id.* at 643.) Mrs. Fischler locked her daughter and a friend in the car, entered her home, and saw petitioner standing inside. (*Id.* at 644-45.) Mrs. Fischler screamed loudly, triggering her home's alarm system. (*Id.* at 646.) At that point, Contreras ran down the stairs with his gun in his hand, and he and petitioner fled the property on foot. (*Id.*) Several hours later, at approximately 8:25 p.m., two Nassau County police officers apprehended petitioner and Contreras. (*Id.* at 708-11.) Shortly thereafter, two show-up identifications were made by Khan and Mrs. Fischler identifying the petitioner and Contreras as the men who intruded the home earlier that day. (*Id.* at 569-70, 654-55.) The following day, a Nassau County police detective recovered the gun Contreras had used from the location where petitioner and Contreras had been apprehended, and where Contreras told another detective the gun was hidden. (*Id.* at 355-70, 464-65.)

2. Evidence Presented by Petitioner

Petitioner testified in his defense at trial. During his testimony, petitioner explained that he had spoken to Contreras only once prior to the date of the alleged crime. (*Id.* at 764.) During their initial meeting, petitioner overheard Contreras talking to another

---

[1] The Court notes that this evidence was based upon the trial testimony of Chauca.

person on the street about a construction job, and petitioner joined the conversation to tell Contreras that petitioner needed a job. (*Id.* at 766-67.) Several days later, on May 21, 2003, Contreras approached petitioner and asked if petitioner wanted "to see about the job" because Contreras was "going to head over there now." (*Id.* at 768-69.) Approximately thirty to forty-five minutes later, after petitioner had gone home after running an errand, petitioner met Contreras on the street and they both got into a cab. (*Id.* at 769-71.) While they were in the cab, Contreras told petitioner that "the person should be home" and that they were going to Far Rockaway. (*Id.* at 773.) Petitioner further testified that they drove to a house in Queens, where Contreras went inside for approximately ten minutes and left petitioner in the cab. (*Id.* at 774-75.) Petitioner believed that this house was "the house with the job." (*Id.* at 775.) When Contreras returned to the cab, he told petitioner that "the person is not there" and that Contreras wanted to make a "quick stop." (*Id.* at 775.) Contreras told the cab driver something in Spanish, which petitioner did not understand, and they proceeded to drive to the house in Hewlett Neck. (*Id.* at 775-77.)

Petitioner testified that upon arriving at the subject property, Contreras walked up to the front door while petitioner waited in the car. (*Id.* at 778-79.) Petitioner did not see Contreras enter the house. (*Id.* at 779.) Approximately fifteen to twenty minutes later, Chauca said to petitioner "your friend's calling" and pointed to the front of the house, where petitioner observed Contreras gesturing for petitioner to come over. (*Id.* at 780.) Petitioner then walked up the driveway and saw Contreras speaking to Khan. (*Id.* at 780-81.) Petitioner waited in the driveway for approximately five to seven minutes until Khan "allow[ed]" him into the house. (*Id.* at 782.) Petitioner sat down

inside the front door and observed Khan "smiling" and talking with Contreras like she knew him. (*Id.* at 782-83.)

Subsequently, while petitioner was playing with the dogs in the house, Contreras and Khan went upstairs. (*Id.* at 784.) Petitioner did not see Contreras with a gun. (*Id.*) Petitioner then began to "wonder why I am sitting there" and he yelled "I'm going out to the cab" and walked out the door. (*Id.* at 785.) Petitioner testified that he had been in the house no longer than ten minutes at this point. (*Id.*) After returning to the cab, Chauca began to complain that Contreras was taking too long and he pulled the cab into the driveway. (*Id.* at 786.) Chauca told petitioner that he wanted to talk to Contreras and that petitioner should show Chauca where Contreras was. (*Id.* at 787.) Chauca and petitioner then got out of the cab and walked to the front door, at which point petitioner opened the door and yelled inside, "the cab driver's [sic], he wants to leave," to which petitioner heard no response. (*Id.*) Petitioner testified that Chauca then entered the house and "started taking stuff." (*Id.* at 788.) While Chauca walked between the back and the front of the house, petitioner yelled upstairs, "yo, come on," and Contreras responded he was coming. (*Id.*) According to petitioner, "that was the last time" he saw Chauca. (*Id.*)

Shortly thereafter, petitioner heard the doorbell ring and said "somebody's at the door." (*Id.* at 790.) Contreras then came "running down" and said "let's get the fuck out of here." (*Id.* at 791.) Petitioner testified that Contreras's demeanor was "scared" and that he appeared to be "excited." (*Id.*) Contreras pushed petitioner toward the door, and when petitioner opened the door, he saw "a lady on the side" but "just kept on moving." (*Id.*) When petitioner saw that the cab was no longer parked outside, he ran away on foot. (*Id.*)

Petitioner also admitted both on direct and on cross-examination that he gave a false name, date of birth, and address to the police when he was arrested, and that he used an alias when he testified before the Grand Jury. (*Id.* at 762-63, 802-03.) He also testified that he had previously used aliases and false dates of birth in the past in order to deceive people. (*Id.* at 762, 798-800.)

## B. PROCEDURAL HISTORY

For his conduct, petitioner was tried on the charges of Robbery in the First Degree (N.Y. Penal Law § 160.15) and Burglary in the First Degree (N.Y. Penal Law § 140.30(35). Prior to trial, on January 7, January 12, and January 27, 2004, the trial judge, County Court, Nassau County, conducted a combined *Huntley-Mapp-Wade-Dunaway* suppression hearing regarding various evidence that the prosecution wished to present at trial. On the final day of the hearing (January 27), petitioner rejected a plea deal that would have resulted in an eight-year sentence. (Hr.[2] at 153-54.)

On March 4, 2004, the trial court rendered its decision on the motion to suppress, finding that, *inter alia*, there was probable cause to arrest petitioner, the show-up identifications did not violate petitioner's Constitutional rights, petitioner made a knowing, intelligent, and voluntary waiver of his *Miranda* rights prior to giving a statement to police, and "the gun and the cameras, were not recovered from either of the defendants and as such, are not suppressible." (Tr. of March 4, 2004 Oral Ruling Regarding Suppression at 5-6.)

After a jury trial, petitioner was convicted of Burglary in the First Degree, but acquitted of Robbery in the First Degree. (Tr. at 1023.) Petitioner subsequently was sentenced to a definite term of incarceration of twenty-five years.

Petitioner raised several arguments on direct appeal, namely: (1) the maximum sentence of twenty-five years was harsh, vindictive, and excessive; (2) his trial counsel provided ineffective assistance of counsel by failing to request that lesser included offenses be charged to the jury and by failing to move to suppress evidence; (3) there was no probable cause for his arrest; and (4) the show-up identifications were unduly suggestive. On May 30, 2006, the Appellate Division, Second Department ("Appellate Division") upheld the conviction, but modified petitioner's sentence to a determinate term of fifteen years' imprisonment in the interest of justice. *People v. Simmons*, 815 N.Y.S.2d 484, 484 (App Div. 2006). As to petitioner's sentence, the Appellate Division explained:

> The defendant, who has no prior felony convictions and no history of violent crime, was offered a sentence of a determinate term of 8 years imprisonment as part of a plea bargain. His more culpable co-defendant pleaded guilty to robbery in the first degree and burglary in the first degree, and was sentenced to a determinate term of 15 years imprisonment. Under the circumstances, the sentence of 25 years imprisonment raises the inference that the defendant was penalized for exercising his right to a jury trial.

*Id.* at 485. Accordingly, the court reduced petitioner's sentence to a determinate term

[2] "Hr." refers to the transcript of the suppression hearing.

of fifteen years' imprisonment. (*Id.*) Additionally, the court concluded that petitioner was not denied his right to effective assistance of counsel and that all other claims were without merit. *Id.* Petitioner filed an application for leave to appeal the Appellate Division's decision to the New York Court of Appeals, which the Court of Appeals denied on August 25, 2006. *People v. Simmons*, 855 N.E.2d 808 (N.Y. 2006). Petitioner's judgment of conviction thus became final on November 23, 2006. (Pet. at 5.)

On November 8, 2007, petitioner filed a *pro se* motion to vacate his conviction pursuant to N.Y. Criminal Procedure Law § 440.10, arguing that he was denied effective representation of counsel because counsel failed to: (1) "preserve the issue of a harsh and vindictive sentence that resulted in the defendant being penalized for exercising his right to a jury trial," (2) "request that lesser included offenses be charged to the jury depriving the defendant of his right to a fair trial," and (3) "move to suppress the physical evidence including the handgun carried by co-arrestee Contreras." (Mem. of Law in Support of § 440.10 Mot. at 25.) On December 17, 2007, trial court denied the motion. (Resp. Aff. in Opp. ¶ 10.) On March 6, 2008 the Appellate Division denied petitioner's leave to appeal from the trial court's denial. (*Id.*)

By petition dated March 26, 2008, petitioner filed for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On May 8, 2008, the respondent filed a motion to dismiss the petition as untimely. On February 13, 2009, this Court issued an Order directing the parties to submit additional briefing on the issue of equitable tolling and directing respondent to simultaneously address the merits of the petition. Petitioner submitted an affidavit dated March 26, 2009 on the issue of equitable tolling. Respondent filed a renewed motion to dismiss the petition and a memorandum of law in opposition to the petition on June 12, 2009. Petitioner submitted a reply and memorandum of law in support thereof dated September 21, 2009.

The Court has fully considered all of the submissions and arguments of the parties.

## II. DISCUSSION

Respondent seeks to dismiss the instant habeas corpus petition because petitioner failed to file it within the applicable statute of limitations provided by 28 U.S.C. § 2244(d)(1). For the reasons set forth below, this Court concludes that Simmons' petition is untimely under Section 2244(d)(1) and there is no basis for equitable tolling. In any event, having analyzed the merits of petitioner's claims in an abundance of caution, the Court also finds that petitioner's claims are meritless.

### A. The Instant Habeas Petition Must be Dismissed as Untimely

#### 1. Statute of Limitations

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year statute of limitations on state prisoners seeking habeas corpus review in federal court. 28 U.S.C. § 2244(d)(1). The statute begins to run from the latest of:

(A) the date on which the [petitioner's] judgment [of conviction] became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of

the Constitution or laws of the United States is removed, if applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*Id.* § 2244(d)(1)(A)-(D). Pursuant to AEDPA, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2); *see also Smith v. McGinnis*, 208 F.3d 13, 15-16 (2d Cir. 2000). The Second Circuit has held that a state court application or motion for collateral relief is "'pending' from the time it is first filed until finally disposed of and further appellate review is unavailable under the particular state's procedures." *Bennett v. Artuz*, 199 F.3d 116, 120 (2d Cir. 1999); *see also Carey v. Saffold*, 536 U.S. 214, 219-21 (2002); *Gant v. Goord*, 430 F. Supp. 2d 135, 138 (W.D.N.Y. 2006). In addition, for purposes of subsection (A), Supreme Court Rule 13.1 provides that the time for a petitioner to seek review in the United States Supreme Court expires ninety days after either the conclusion of the direct review of petitioner's conviction or the expiration of time for seeking direct review. Thus, a petitioner's conviction becomes "final," and the statute of limitations begins to run, upon the expiration of this ninety-day period. *See Williams v. Artuz*, 237 F.3d 147, 150 (2d Cir. 2001) ("[A] petitioner's 'conviction bec[omes] final for [AEDPA] purposes when his time to seek direct review in the United States Supreme Court by writ of certiorari expire[s].'") (quoting *Ross v. Artuz*, 150 F.3d 97, 98 (2d Cir. 1998) (alterations in original)). *Accord Pratt v. Greiner*, 306 F.3d 1190, 1195 n.1 (2d Cir. 2002).

2. Application

a. Timeliness

In the instant case, it is undisputed that petitioner's judgment of conviction became final on November 23, 2006. If petitioner had not filed for any post-conviction relief or collateral review of his conviction, the statute of limitations under AEDPA would have run for one year, or 365 days, beginning on this date.[3] Petitioner, however, did file a motion to vacate his conviction, pursuant to New York Criminal Procedure Law Section 440.10, on November 8, 2007, thus tolling the applicable statute of limitations while that motion was pending in state court.[4] The

---

[3] The Court takes judicial notice of the fact that 2007 was not a leap year, and so November 23, 2006 to November 23, 2007 consisted of 365 days.

[4] Petitioner's motion papers are dated November 8, 2007, so this is the date that is used in this Circuit for determining when petitioner properly filed his state court papers for the purposes of AEDPA. *See Fernandez v. Artuz*, 402 F.3d 111, 116 (2d Cir. 2005) ("We therefore apply the federal mailbox rule to ascertain when a state petition is 'properly filed' for purposes of tolling the AEDPA statute of limitations."). In any event, neither petitioner nor respondent disputes this date as the date petitioner filed his motion to vacate.

date upon which petitioner filed his Section 440 motion (November 8, 2007) was 350 days after his conviction had become final, which would leave petitioner with only fifteen days to file a timely writ of habeas corpus after a decision on his motion was rendered.

The Appellate Division denied petitioner's motion on December 17, 2007, and subsequently denied petitioner leave to appeal on March 6, 2008. Thus, petitioner's motion was "pending" for habeas purposes—and the statute of limitations was tolled—from November 8, 2007 until March 6, 2008. Accordingly, the statute of limitations began to run again on March 7, 2008 and expired fifteen days later on March 21, 2008. However, petitioner did not file his habeas petition until March 26, 2008,[5] five days after the expiration of the statute of limitations, and his petition therefore is untimely.

As an initial matter, petitioner argues that the statute of limitations was tolled until March 14, 2008, when he received actual notice of the Appellate Division's decision regarding his motion to vacate judgment (*see* Petitioner's Affidavit in Support of Motion for the Court Ordered Submission of

the Issue of the Equitable Tolling of Time Regarding the AEDPA's Statute of Limitations, dated March 26, 2009 ("Simmons March 26, 2009 Affidavit") at ¶ 6), rather than until March 6, 2008, when the Appellate Division's decision denying leave to appeal was entered. Thus, petitioner believed that his petition was timely filed because it was filed within fifteen days of his receipt of the March 6, 2008 decision. (*Id.* at ¶¶ 6-7; Reply at 24.) However, this argument fails as a matter of law. It is well-settled that the statute of limitations under AEDPA is tolled only while the post-conviction or collateral review claim is "pending," and that such claim terminates when the petitioner has no further appellate remedies available to him under New York Law. Here, petitioner's motion to vacate judgment ceased to be "pending" for the purposes of AEDPA on the date that the Appellate Division denied leave to appeal. Thus, the date petitioner received actual notice of the Appellate Division's decision is irrelevant for the purposes of tolling the statute of limitations under AEDPA in this case. *See Foster v. Phillips*, No. 03-cv-3629 MBM DF, 2005 WL 2978686, at *4 (S.D.N.Y. Nov. 7, 2005) ("Thus, once the Appellate Division denies leave to appeal the trial court's denial of a Section 440.10 motion, a petitioner has reached 'the end of the road within the state system' with respect to that motion." (quoting *Klein v. Harris*, 667 F.2d 282, 284 (2d Cir. 1981))); *see also Forman v. Artuz*, 211 F. Supp. 2d 415, 419 (S.D.N.Y. 2000) (rejecting argument that statute of limitations was tolled until petitioner received actual notice of state court's final decision); *Ramos v. Walker*, 88 F. Supp. 2d 233, 235-36 (S.D.N.Y. 2000) ("[P]etitioner had no appellate remedies available to him under New York law with respect to his Section 440.10 motion once leave to appeal was denied . . . . Hence . . . any failure to

---

[5] The parties also do not dispute that, because of the prison mailbox rule applied by this Circuit to this context, the date petitioner delivered his habeas petition to prison officials is the date on which his petition was deemed "filed" for AEDPA purposes. *See, e.g.*, *Adeline v. Stinson*, 206 F.3d 249, 251 n.1 (2d Cir. 2000) (per curiam) ("When a prisoner is proceeding *pro se*, as petitioner then was, federal courts generally consider his or her petition for habeas corpus to have been filed as of the date it was given to prison officials for forwarding to the court clerk."); *Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir. 2001) (concluding "that the district court properly extended the prison mailbox rule to petitions for writs of habeas corpus").

serve petitioner with a copy of the order denying his motion for leave to appeal to the Appellate Division was immaterial."); *Hunter v. Greiner*, No. 99-cv-4191 (SAS), 2000 WL 245864, at *3 (S.D.N.Y. March 3, 2000) (stating that the tolling period "generally expires when the motion is decided regardless of when the petitioner learns of that decision"). *Accord Anderson v. O'Gara*, No. 01-cv-5712 WHP, 2002 WL 1633917, at *3 (S.D.N.Y. July 23, 2002) ("The tolling ended, however, on February 1, 2000, when the *coram nobis* petition was denied because no further review was available for his *coram nobis* petition in the State courts."). Consequently, because petitioner had no further appellate remedies in the state court system as of the date that the Appellate Division denied leave to appeal on March 6, 2008, the statute of limitations on his filing a timely writ of habeas corpus began to run again on March 7, 2008, and it expired on March 21, 2008. *Cf. Umanzor v. Smith*, No. 06-cv-3874 (JFB), 2007 WL 496449, at *2 (E.D.N.Y. Feb. 12, 2007) ("The statute of limitations resumed running on February 25, 2006, the day after the New York State Court of Appeals denied petitioner's application for leave to appeal from the decision of the Appellate Division, Second Department, which denied petitioner's *coram nobis* application."). Thus, the instant habeas petition, filed on March 26, 2008—five days after the expiration of the statute of limitations—is untimely.

### b. Equitable Tolling

The Second Circuit has adopted the rule articulated by a majority of circuits that characterizes AEDPA's one-year period to file a writ of habeas corpus as a statute of limitations rather than a jurisdictional bar, thus enabling courts to equitably toll that period. *See Smith*, 208 F.3d at 17 (collecting cases). In other words, even where a petition is untimely, "[b]ecause the one-year AEDPA filing period is a statute of limitations and not a jurisdictional bar, courts may extend the period to prevent inequity." *Anderson*, 2002 WL 1633917, at *4. Equitable tolling, however, is applied only in "'rare and exceptional circumstance[s]'" and should be awarded only after consideration of all the facts and circumstances. *See Smith*, 208 F.3d at 17 (quoting *Turner v. Johnson*, 177 F.3d 390, 391-92 (5th Cir. 1999)); *Baldayaque v. United States*, 338 F.3d 145, 150 (2d Cir. 2003) (quoting *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 965 (2d Cir. 1981)).

To equitably toll AEDPA's statute of limitations, a petitioner bears the burden of showing affirmatively that equitable tolling is warranted. *See Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005); *Hizbullahankhamon v. Walker*, 255 F.3d 65, 75 (2d Cir. 2001). Specifically, a petitioner must demonstrate (1) that extraordinary circumstances prevented the timely filing of a petition for a writ of habeas corpus; and (2) that he acted with reasonable diligence during the period he seeks to toll. *Smith*, 208 F.3d at 17; *see also Hizbullahankhamon*, 255 F.3d at 75. As to the first prong, to show that extraordinary circumstances prevented the timely filing of his petition, "petitioner must demonstrate a causal relationship between the extraordinary circumstances on which his claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances." *Baldayaque*, 338 F.3d at 150 (quoting *Hizbullahankhamon*, 255 F.3d at 75 (2d Cir. 2001)). The Second Circuit has "[a]s a general matter . . . set a high bar to deem circumstances sufficiently 'extraordinary' to warrant equitable tolling." *Dillon v. Conway*, --- F.3d ----, 2011 WL 1548955, at *4 (2d Cir. Apr. 26, 2011). As

to the second prong, the degree of diligence required to satisfy this standard "is not 'extreme diligence' or 'exceptional diligence,' it is *reasonable* diligence." *Baldayaque*, 338 F.3d at 153 (emphasis in original). Petitioner's diligence should be evaluated in light of the facts surrounding his particular situation. *Id.*

Notably, the mere fact that a petitioner is proceeding *pro se* and may be ignorant of the law are not sufficient grounds for equitable tolling. *See Smith*, 208 F.3d at 18 (holding that petitioner's *pro se* status does not establish sufficient ground for equitable tolling); *Ayala v. Miller*, No. 03-cv-3289 (JG), 2004 WL 2126966, at *2 (E.D.N.Y. Sept. 24, 2004) ("Neither a prisoner's pro se status, nor his lack of expertise, provides a basis for equitable tolling of AEDPA's statute of limitations."); *Gillyard v. Herbert*, No. 01-cv-3427 (DC) (GWG), 2003 WL 194692, at *3 (S.D.N.Y. Jan. 30, 2003) ("A petitioner's *pro se* status does not by itself merit equitable tolling."); *Francis v. Miller*, 198 F. Supp. 2d 232, 235 (E.D.N.Y. 2002) ("Petitioner's further assertions—that he has limited education, is ignorant of the law and legal procedure, lacked funds to hire another attorney, had limited access to legal assistance that was available to prisoners, and was allowed limited use of the prison law library—also are not extraordinary circumstances that warrant equitable tolling for the extended period of delay in this case."). Similarly, a petitioner is not entitled to equitable tolling because he is incarcerated and had limited access to the internet—routine restrictions on prison life do not constitute extraordinary circumstances. *See Corrigan v. Barbery*, 371 F. Supp. 2d 325, 330 (W.D.N.Y. 2005) ("In general, the difficulties attendant on prison life, such as transfers between facilities, solitary confinement, lockdowns, restricted access to the law library, and an inability to secure court documents, do not

by themselves qualify as extraordinary circumstances."); *Lindo v. Lefever*, 193 F. Supp. 2d 659, 663 (E.D.N.Y. 2002) ("Transfers between prison facilities, solitary confinement, lockdowns, restricted access to the law library and an inability to secure court documents do not qualify as extraordinary circumstances."); *cf. Brooks v. Olivarez*, No. C 98-134 MJJ (PR), 1998 WL 474160, at *2 (N.D. Cal. Aug. 5, 1998) ("Congress gave prisoners one year to get to federal court after their convictions became final . . . That one year gives the prisoner plenty of time to get to federal court and leaves room for the inevitable delays in mail, unpredictable lockdowns, as well as interruptions in research and writing time common in prison."). In addition, the fact that petitioner's late filing was unintentional does not rise to the level of an extraordinary circumstance meriting equitable tolling. *See, e.g.*, *Hickey v. Senkowski*, No. 02-cv-1437 (DC), 2003 WL 255319, at *4 (S.D.N.Y. Feb. 4, 2003) (holding that *pro se* petitioner's mistake did not constitute an extraordinary or unusual circumstance meriting equitable tolling).

Moreover, the Court emphasizes that, in circumstances where there has been a lengthy and inexplicable delay in the timely filing of a federal habeas petition, an uncorroborated assertion by a petitioner that he did not receive the final state decision in the prison mail is not a sufficient basis to invoke the doctrine of equitable tolling. *See, e.g.*, *Thrower v. Laird,* No. 06-cv-4864 (JSR) (AJP), 2006 WL 3735649, at *2 (S.D.N.Y. Dec. 14, 2006) (collecting cases). To allow such an assertion to qualify for the safe harbor that equitable tolling provides would be to completely undermine the AEDPA limitation period by allowing untimely petitions to obtain access to the federal courts based upon a conclusory, unsubstantiated excuse.

Petitioner claims that equitable tolling should apply here because: (1) he diligently pursued his rights in filing his Section 440.10 motion (Simmons March 26, 2009 Affidavit ¶ 18); and (2) extraordinary circumstances prevented petitioner from timely filing his habeas petition, namely, the Appellate Division's six-day delay in mailing to petitioner its decision denying him leave to appeal, which resulted in an overall eight-day time lapse between the date the decision was issued (March 6, 2008) and the date petitioner received the decision (March 14, 2008). (*Id.* ¶ 17, 19.) Petitioner argues that, prior to his physical receipt of the Appellate Division's decision, it was "physically impossible" for him to know that the Appellate Division had issued its opinion denying him leave to appeal because petitioner "has no legal representation, no internet access, [and] his only line of communication with the Court is via the U.S. Mail and the Legal Mail System in the Eastern NY Correctional Facility." (*Id.* ¶ 20.)

As an initial matter, the Court notes that petitioner has presented uncontroverted evidence that there was an eight-day delay in his receipt of the Appellate Division's March 6, 2008 decision. Specifically, in his response to respondent's original motion, plaintiff attached a copy of the postal envelope in which he received the March 6, 2008 decision denying him leave to appeal from the order of the County Court rejecting his motion to vacate the judgment. (*See* Reply/Traverse to Respondent's Motion, dated May 20, 2008, Ex. 1.) That postal envelope unequivocally demonstrates that, although the Appellate Division's decision was rendered on March 6, 2008, it was not stamped by the U.S. Postal Service until March 12, 2008 and was not received at the Eastern Correctional Facility until March 14, 2008. Therefore, the dated stamps on the envelope from the post office and the prison

completely corroborate petitioner's affidavit, which states that he did not receive the Appellate Division's decision until March 14, 2008. (*See* Petitioner's Affidavit in Support of Reply/Traverse to Respondent's Motion ¶ 7.)

However, after reviewing all of the facts and circumstances of this case, the Court finds that petitioner's case does not present extraordinary circumstances warranting equitable tolling. In particular, the Court finds that an eight-day delay in petitioner's receipt of the Appellate Division's decision—a delay which occurred during the course of the ordinary mailing of the decision—does not constitute an extraordinary circumstance when considered in conjunction with the fact that petitioner inexplicably waited 350 days to file his Section 440.10 motion and the fact that, even with the mailing delay, petitioner still had seven days left upon his receipt of the March 6, 2008 order to file a timely petition and yet failed to act within this week-long period due solely to his mistaken belief that he had more time to file before the statute of limitations expired.

As a threshold matter, the Court recognizes that a delay in mailing may, in certain cases, qualify as an extraordinary circumstance warranting equitable tolling. *See Saunders v. Senkowski*, 587 F.3d 543, 550 (2d Cir. 2009). However, as the Second Circuit has noted, the cases in which such extraordinary circumstances were found each involved prolonged mailing delays typically of several months in duration. *Id.* (citing *Diaz v. Kelly*, 515 F.3d 149 (2d Cir. 2008)); *see also Diaz*, 515 F.3d at 155 (noting that "[o]ther circuits have concluded that *prolonged* delay by a state court in sending notice of a ruling that completes exhaustion of state court remedies can toll the AEDPA limitations period" and applying equitable tolling to period from

June 6, 2000 until January 31, 2001 (emphasis added) (citing *Knight v. Schofield*, 292 F.3d 709, 711 (11th Cir. 2002) (eighteen months); *Woodward v. Williams*, 263 F.3d 1135, 1142-43 (10th Cir. 2001) (approximately one month); *Phillips v. Donnelly*, 216 F.3d 508, 511 (5th Cir. 2000) (almost four months)) (additional citations omitted)). In contrast, in *Saunders*, the Second Circuit held that a five-day delay in petitioner's receipt of a court order "occasioned by it being mailed to petitioner over the Memorial Day weekend did not constitute an 'extraordinary circumstance.'" *Saunders*, 587 F.3d at 550. In so holding, the Second Circuit stated that they were "aware of no case holding that a delay occasioned by the normal course of the mail, as lengthened by a regularly scheduled holiday, constitutes an 'extraordinary' circumstance for purposes of equitable tolling, and we decline to so hold now." *Id.* Similarly, the Fourth Circuit, in *Spencer v. Sutton*, 239 F.3d 626 (4th Cir. 2001), held that where the petitioner had waited to file his motion for collateral relief in state court until one day before the expiration of the statute of limitations, he was not entitled to equitable tolling due to the delay in time that it took to mail him the state court decision denying his motion. *Id.* at 630. In reversing the district court's decision equitably tolling the statute of limitations, the Fourth Circuit explained:

> The district court equitably tolled the statute of limitations because [petitioner] waited until the final day of AEDPA's one-year limitations period before filing his second state motion for appropriate relief, thus allowing himself but a single day after the state court's final disposition in which to file his federal habeas petition—an insufficient amount of time within which for [petitioner] to receive notice of the decision via the ordinary mail. Even assuming arguendo that an *inordinate delay* in the delivery of mail could be so regarded, we do not believe that the *ordinary time that it takes to deliver the mail* can be regarded as a circumstance external to a party's own conduct within the contemplation of the equitable tolling doctrine. . . . Every person knows, or should know, that it can take at least several days to receive mail even from within the same postal jurisdiction, and he can, and may reasonably be required to, adjust his conduct accordingly. Ordinary delivery time is not a "rarity," nor is the charge of knowledge of such to the habeas petitioner "unconscionable."

*Id.* (internal quotation marks, citations, and alterations omitted) (emphasis in original). Thus, the court held that even if mail delivery time could be grounds for equitable tolling in certain cases, it would not apply the doctrine in petitioner's case because the fact that petitioner "had only one day remaining in the limitations period is solely the result of his own strategic decision" to wait to file his state court motion. *Id.* The court noted that "[w]ere it not for [petitioner's] own delay, the time needed for ordinary mail delivery almost certainly would not have affected the timeliness of his habeas petition." *Id.*

Likewise, in this case, if petitioner had not waited until day 350 to file his Section 440.10 motion, the eight-day mailing delay would almost certainly have had no impact on his ability to file a timely petition. Moreover, petitioner does not contend that the delay in mailing the decision to him was caused by any exigent or unusual circumstances, or that the decision was sent

to him outside the "normal course of the mail." *Saunders*, 587 F.3d at 550. In addition, even with the delay, petitioner received the Appellate Division's decision with seven days remaining before the statute of limitations expired and, therefore, could have filed a timely petition had he acted promptly upon receipt of the state court decision. Accordingly, the Court finds that these circumstances—a mere eight-day delay caused by the ordinary course of the mails, coupled with petitioner's original delay in filing his Section 440.10 motion and his subsequent delay in filing his habeas petition after receipt of the Appellate Division's decision, even when he knew that the time remaining to file a timely petitioner was limited—do not constitute "extraordinary circumstances" that would warrant applying equitable tolling to petitioner's case. *See Hizbullahankhamon*, 255 F.3d at 75-76 (upholding district court decision that petitioner was not entitled to equitable tolling where he had "failed to exercise reasonable diligence by waiting over 250 days before filing" his first motion for collateral relief (internal quotation marks omitted)); *Smith*, 208 F.3d at 17-18 ("Smith claims that he is entitled to equitable relief because (1) he could not file his federal petition until he exhausted his state remedies; and (2) he diligently filed his state coram nobis petition and then filed his federal habeas petition only 87 days after the state denied collateral relief. . . . Smith's case does not present extraordinary or exceptional circumstances warranting equitable tolling. Smith's delays in seeking collateral review of his conviction do not show reasonable diligence. In addition, the tolling provision of Section 2244(d)(2) already accommodates the exhaustion requirements that prisoners face, so the mere fact that Smith exhausted his claims in the coram nobis petition does not trigger equitable tolling. Finally, Smith's *pro se*

status until March 1997 does not merit equitable tolling. Smith's petition therefore was not timely." (internal citations omitted)); *Pinero v. Greiner*, 519 F. Supp. 2d 360, 382 (S.D.N.Y. 2007) (citing *Smith*, 208 F.3d at 17); *Corrigan*, 371 F. Supp. 2d at 332 ("[T]he Court cannot find that [petitioner's] case presents extraordinary or exceptional circumstances which would warrant equitable tolling. There were considerable delays between [petitioner's] various attempts to seek collateral review of his conviction. For instance [petitioner] waited over two and a half years to file his second motion to vacate pursuant to CPL § 440.10. These delays do not show reasonable diligence."). *Cf. Rush v. Lempke*, No. 09-cv-3464 (JFB), 2011 WL 477807, at *8 (E.D.N.Y. Feb. 2, 2011) (petitioner could not show reasonable diligence where he waited seven months after he was denied final leave to appeal before requesting an extension of time to file his habeas petition). Therefore, because petitioner has not demonstrated the existence of extraordinary circumstances out of his control that prevented him from filing a timely habeas petition, he is not entitled to equitable tolling.

Furthermore, as indicated *supra*, the Court notes that petitioner's incarceration, his *pro se* status, and his limited internet access also are not "extraordinary circumstances" warranting equitable tolling. *See, e.g.*, *Corrigan*, 371 F. Supp. 2d at 330 ("In general, the difficulties attendant on prison life, such as transfers between facilities, solitary confinement, lockdowns, restricted access to the law library, and an inability to secure court documents, do not by themselves qualify as extraordinary circumstances."); *Ayala*, 2004 WL 2126966, at *2 ("Neither a prisoner's pro se status, nor his lack of expertise, provides a basis for equitable tolling of AEDPA's statute of limitations."); *Gillyard*, 2003 WL 194692, at

*3 ("A petitioner's *pro se* status does not by itself merit equitable tolling."); *Francis*, 198 F. Supp. 2d at 235 ("Petitioner's further assertions—that he has limited education, is ignorant of the law and legal procedure, lacked funds to hire another attorney, had limited access to legal assistance that was available to prisoners, and was allowed limited use of the prison law library—also are not extraordinary circumstances that warrant equitable tolling for the extended period of delay in this case."). The fact that these circumstances may have led to petitioner's mistaken belief that he had more time remaining before the statute of limitations expired than he actually did does not change the Court's conclusion that petitioner is not entitled to equitable tolling. *See, e.g.*, *Hickey*, 2003 WL 255319, at *4 (holding that *pro se* petitioner's mistake did not constitute an extraordinary or unusual circumstance meriting equitable tolling).

* * *

In sum, because the petition is untimely and there is no basis for equitable tolling, the petition must be dismissed. Nevertheless, in an abundance of caution, the Court has analyzed the merits of petitioner's claims and, for the reasons set forth *infra*, finds each of them to be without merit.

B. Merits Analysis

1. Standard of Review

To determine whether petitioner is entitled to a writ of habeas corpus, a federal court must apply the standards of review provided in 28 U.S.C. § 2254, as amended by AEDPA, which provides in relevant part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "'Clearly established Federal law'" is comprised of "'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

AEDPA establishes a deferential standard of review: "'a federal habeas court

may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). The Second Circuit added that, while "'some increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" *Gilchrist*, 260 F.3d at 93 (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo*.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

### 2. Application

Petitioner has relied upon the briefs he submitted on direct appeal and in support of his Section 440.10 motion and has accordingly presented two grounds in his habeas petition: (1) he received ineffective assistance of trial counsel; and (2) his sentence was vindictive, harsh, and excessive. (Pet. at 4.) The Court will address each of these claims in turn.

### a. Ineffective Assistance of Counsel

Petitioner contends that he received ineffective assistance of trial counsel because counsel: (1) failed to request that lesser included offenses be charged to the jury; (2) failed to move to suppress evidence; and (3) failed to preserve for appeal petitioner's objection that his sentence was harsh, vindictive, and

excessive. As discussed below, the Court finds that each of petitioner's claims is without merit.

#### i. Standard

Under the standard promulgated in *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: (1) "counsel's representation fell below an objective standard of reasonableness," *id.* at 688, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

The first prong requires a showing that counsel's performance was deficient. However, "[c]onstitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). The performance inquiry examines the reasonableness of trial counsel's actions under all circumstances, keeping in mind that a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Greiner*, 417 F.3d at 319 (quoting *Rompilla v. Beard*, 545 U.S. 374, 408 (2005)). In assessing performance, a court must apply a "'heavy measure of deference to counsel's judgments.'" *Greiner*, 417 F.3d at 319 (quoting *Strickland*, 466 U.S. at 691). "A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision."

*DeLuca v. Lord*, 77 F.3d 578, 588 n.3 (2d Cir. 1996), and "'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Id.* (quoting *Strickland*, 466 U.S. at 690). Moreover, "'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *DeLuca*, 77 F.3d at 588 (quoting *Strickland*, 466 U.S. at 690-91).

The second prong focuses on prejudice to the petitioner. The petitioner is required to show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In this context, "reasonable probability" means that the errors are of a magnitude such that they "'undermine[] confidence in the outcome.'" *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 694). "'The question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Henry v. Poole*, 409 F.3d 48, 63-64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695).

"'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 691). Moreover, "[u]nlike the determination of trial counsel's performance under the first prong of *Strickland*, the determination of prejudice 'may be made with the benefit of hindsight.'" *Hemstreet v. Greiner*, 491 F.3d 84, 91 (2d Cir. 2007) (quoting *Mayo v.*

*Henderson*, 13 F.3d 528, 534 (2d Cir. 1994)).

This Court proceeds to examine the petitioner's claims, keeping in mind that the habeas petitioner bears the burden of establishing both deficient performance and prejudice. *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004).

### ii. Analysis

As a threshold matter, the Court notes that petitioner's ineffective assistance of counsel arguments were rejected by the Appellate Division on the merits. *See Simmons*, 815 N.Y.S.2d at 485 (noting that petitioner "was not denied his right to effective assistance of counsel" (citing *People v. Benevento*, 697 N.E.2d 584 (N.Y. 1998))). Thus, because the Appellate Division's decision was an "adjudicat[ion] on the merits," *see* 28 U.S.C. § 2254(d), it is entitled to the deferential standard of review under AEDPA. *See, e.g.*, *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) ("When the state court has adjudicated the merits of the petitioner's claim, we apply the deferential standard of review established by [AEDPA] . . . .").

### (1) Failure to Request Lesser Included Offenses be Charged to the Jury

Petitioner claims that his trial counsel was ineffective for failing to request that the court charge the jury with Criminal Trespass in the First Degree, N.Y. Penal Law § 140.17, or Criminal Trespass in the Second Degree, N.Y. Penal Law § 140.15, as lesser included offenses to Burglary in the First Degree. (App. Br.[6] at 36-39.) As to the first

---

[6] "App. Br." refers to petitioner's appellate brief that petitioner's appellate counsel filed in connection with petitioner's direct appeal of his conviction. Petitioner incorporated this brief by reference in his petition. (Pet. at 4.)

prong of the *Strickland* standard, the Court finds that counsel's conduct did not "[fall] below an objective standard of reasonableness," *Strickland*, 466 U.S. at 694, such that habeas relief is warranted.

Under New York law, in order for the court to charge lesser included offenses, there must be a reasonable view of the evidence that would allow the jury to conclude that the defendant committed the lesser but not the greater offense. *See* N.Y. Crim. Proc. L. § 300.50(1); *see also People v. Scarborough*, 402 N.E.2d 1127, 1129-30 (N.Y. 1980) (holding if there is no reasonable view of the evidence that would allow a jury to conclude that the defendant committed the lesser but not the greater crime the submission of a lesser included offense is improper); *Colon v. Smith*, 723 F. Supp. 1003, 1007-08 (S.D.N.Y. 1989) ("This analysis first requires that it must be theoretically impossible to commit the greater crime without committing the lesser. . . . Second, there must be a reasonable view of the evidence in the particular case that would permit the jury to conclude that the defendant committed the lesser but not the greater offense. Under N.Y. Crim. Proc. Law § 300.50, if there is no reasonable view of the evidence which would support such a finding, the Court may not submit such lesser offense." (internal citations omitted)).

In the instant case, there is no reasonable view of the evidence to justify a charge of Criminal Trespass in the First or Second Degree. As noted in petitioner's appellate brief, petitioner contends that his testimony "provided a plausible explanation for his presence at the home of the complainants" and that "there was no evidence in the People's case that [Simmons] saw or had any knowledge of Contreras' gun." (App. Br. at 36-37.) Thus, according to petitioner, "[t]he jury . . . had before it competent evidence that Mr. Simmons was not guilty

of *any* crime." (*Id.* at 37 (emphasis added).) In other words, as per petitioner's appellate brief, "[a]t the time of the charge conference, based upon the evidence and lack of evidence, the jury could have acquitted [Simmons] of *all crimes*." (*Id.* at 37-38 (emphasis added).) Accordingly, by petitioner's own argument, a "reasonable view" of the evidence would have demonstrated *not* that petitioner was guilty of criminal trespass, but instead that he was not guilty of *any* crime. Petitioner does not state what evidence the jury could have relied upon to convict him of criminal trespass but not of burglary, and, in fact, petitioner acknowledges that "the jury may well have acquitted on the lesser charge of Criminal Trespass in the First Degree . . . ." (*Id.* at 38.) Thus, although petitioner may believe that he should have been acquitted, an argument that an acquittal was warranted does not necessitate the conclusion that a reasonable view of the evidence would have allowed the jury to convict petitioner of a lesser included offense.

Moreover, even if a reasonable view of the evidence would have allowed the jury to convict petitioner of criminal trespass only, the decision not to request such a charge could reasonably be construed as a tactical decision to adopt an "all or nothing" strategy with regard to petitioner's conviction. Indeed, had the jury credited the evidence that petitioner points to in support of his innocence—namely, that he was present in the home in the hope of getting employment, that he entered the residence after the housekeeper allowed him inside, that he had no intention of committing a crime, and that he was not aware that Contreras had a gun—they could have acquitted him not only of the robbery charge but also of the burglary charge. Thus, counsel's decision to not request a lesser included offense charge could be considered strategic and does not fall outside the bounds of reasonable

professional conduct. *See Torres v. Stinson*, No. 97-cv-5310 (JG), 2000 WL 1919916, at *6 (E.D.N.Y. Dec. 29, 2000) (holding that submission of lesser included offenses may give jurors the ability to find guilt in a crime where the prosecution was unable to prove the elements of the original crime charged; thus, failure to include lesser included offenses may be a proper trial strategy); *Grant v. Bara*, No. 87-cv-9217 (LLS), 1989 WL 146796, at *2 (S.D.N.Y. Nov. 28, 1989) (holding whether to include lesser included offenses is a trial strategy and is entitled to deference); *Colon*, 723 F. Supp. at 1008 (holding that failure to request lesser included offenses may be a proper trial strategy).

In any event, even assuming *arguendo* that counsel erred in not requesting a lesser included offense charge, petitioner cannot demonstrate that he was prejudiced by counsel's failure to do so. Petitioner argues that he provided plausible testimony that he did not possess the requisite intent to commit burglary and that, accordingly, the jury should have been given the opportunity, in the alternative, to convict him of the lesser included offense of criminal trespass. However, while petitioner may have found his testimony to be plausible, the fact that petitioner was convicted for burglary plainly indicates that the jury rejected his alternative explanation in light of the evidence presented by the prosecution and, consequently, that the jury found he *did* possess the intent necessary to be convicted of burglary—a conclusion that was reasonable in light of the evidence and testimony presented against petitioner. Moreover, the fact that the jury acquitted petitioner on the robbery charge also indicates that they carefully weighed all of the evidence, including petitioner's testimony, and convicted petitioner only on the charges for which they believed the prosecution had met its burden. Thus, there

is no indication that the jury would have chosen to convict him on the lesser included offense had they been given the opportunity to do so and, thus, petitioner has failed to establish that he was prejudiced by counsel's alleged errors.

Therefore, this Court cannot conclude that the Appellate Division's finding that petitioner received effective assistance of counsel was contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. Petitioner's application for habeas relief on this ground is denied.

### (2) Failure to Move to Have Evidence Suppressed

Petitioner claims his trial counsel was ineffective because he "failed to object to the trial court's *sua sponte* vacating of the order for suppression hearing without objection and further, failed to move to suppress the items of physical evidence, more particularly, the handgun, as the fruits of an illegal arrest." (App. Br. at 40.). As set forth below, the Court finds this claim to be without merit.

As a general matter, in order to show ineffective assistance of counsel for failure to make a motion to suppress, the underlying motion must be meritorious, and there must be a reasonable probability that the verdict would have been different if the evidence had been suppressed. *United States v. Matos*, 905 F.2d 30, 32 (2d Cir. 1990) (citing *Kimmelman v. Morrison*, 47 U.S. 365, 375-76 (1986)); *Curzi v. United States*, 773 F. Supp. 535, 544 (E.D.N.Y. 1991).

In this case, although petitioner's argument is somewhat difficult to understand, it appears he is objecting to the trial court's ruling that he did not have

standing to move to suppress the gun and, consequently, to trial counsel's failure to challenge that ruling. In particular, petitioner attempts to analogize his case to those where knowing possession of an illegal item is imputed to a defendant under a presumption set forth in the New York Penal Law, and the defendant is therefore granted "automatic standing" to move to suppress that item. Specifically, petitioner points to New York Penal Law Section 220.25(2), which establishes a presumption of possession to anyone in close proximity to narcotics found in open view in a room other than a public place, and Section 265.15, which establishes a presumption of possession for occupants of an automobile when a weapon is found in the automobile. Relying upon these allegedly analogous circumstances, petitioner then argues:

> In the above-cited circumstances, there is a presumption of standing; yet, the presumption can be rebutted. For Mr. Simmons, according to the Court's charge on the law, if Contreras knowingly possessed a loaded and operable handgun during the commission of a Burglary in the Second Degree . . . then regardless of Mr. Simmons' knowledge of the existence of that handgun, he too would be guilty of the higher offense of Burglary in the First Degree. In essence, a theory of strict liability for facts and circumstances totally beyond Mr. Simmons' control significantly raises Mr. Simmons' level of culpability without hope of rebuttal. Certainly, in these circumstances, the same theories of automatic standing should be extended to Mr. Simmons.

(App. Br. at 42.) The Court finds petitioner's argument to be without merit. First, the prosecution did not rely upon the presumptions of possession cited by petitioner, because these presumptions are inapplicable to the circumstances of this case. Here, the gun was not found on petitioner's person or on his co-defendant, but instead was recovered from the public space where petitioner and Contreras had been apprehended (and where Contreras told police he had left the gun). (Tr. at 355-70, 464-65.) Thus, the Court cannot conclude that the trial court's ruling that the gun was "not suppressible" because it was "not recovered from either of the defendants" was contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. (Tr. of March 4, 2004 Oral Ruling Regarding Suppression at 5; *see id.* at 4 (crediting government's evidence that subsequent to petitioner's and Contreras's arrest, "a loaded handgun was found in the proximate area where the defendants were first spotted by the police").) *See People v. Wesley*, 538 N.E.2d 76, 79, 83 (N.Y. 1989) ("*Ponder* established that, as a matter of State constitutional law, a defendant seeking to challenge a search and seizure could not rest upon the fact that the People had charged possession, but was required to demonstrate a personal legitimate expectation of privacy in the searched premises. . . . There remains for our consideration the question whether *Millan* should now be extended to permit all defendants charged with constructive possession to claim standing for that reason alone. We think not. To do so would be to depart from *Ponder* and the cases that have followed it, requiring that a defendant assert the violation of a personal privacy right."). Consequently, because the trial court did not err in ruling that the gun was not suppressible, petitioner's defense counsel acted reasonably in not objecting, because any further motion to suppress would have been futile due to petitioner's lack of

18

standing. *See Mosby v. Senkowski,* 470 F.3d 515, 524 (2d Cir. 2006) ("[Petitioner] cannot maintain that the Fourth Amendment claim underlying his petition is meritorious, and his ineffective assistance claim on that issue fails accordingly."); *see also Hayes v. Tracy,* No. 03CV5237 (SLT), 2005 WL 486912, *5-6 (E.D.N.Y. Jan. 11, 2005) ("Petitioner has not alleged how his rights were violated in the investigation of his case. Thus, he has not established on what basis counsel would have moved to suppress. Petitioner has also not alleged how the eavesdropping warrant was defective, and therefore has not shown what he lost as a result of counsel's failure to challenge it.").

Moreover, the Court rejects petitioner's argument that counsel was ineffective for "fail[ing] to object to the trial court's *sua sponte* vacating of the order for suppression hearing without objection and further, failed to move to suppress the items of physical evidence, more particularly, the handgun, as the fruits of an illegal arrest." (App. Br. at 40.) As an initial matter, based upon the record before the Court, it is clear that the trial court *did* conduct a suppression hearing and expressly addressed the issue of whether the gun was suppressible in its oral ruling, thus indicating that counsel did, in fact, raise the issue of suppression. (*See* Tr. of March 4, 2004 Oral Ruling Regarding Suppression at 6 ("Therefore, the defendant's motion to suppress is denied in all respects.").) Indeed, petitioner does not provide the Court with any copy of a "sua sponte" order "vacating" the suppression hearing, or provide any explanation of when that order was made or what the decision was based upon. Instead, it appears that petitioner may have misunderstood the trial court's March 4, 2004 ruling denying the motion to suppress. Specifically, in his appellate brief, petitioner noted that the suppression hearing was held pursuant to "a stipulation in lieu of motions which involves checking off boxes

on a pre-printed form." (App. Br. at 16-17.) Petitioner's appellate counsel then went on to argue that "[d]espite the order, at the suppression hearings, trial counsel accepted without argument the Court's oral order that the hearings would comprise none of the physical evidence because [petitioner] had no standing to challenge the introduction of physical evidence not recovered from him." (*Id.* at 17.) In support of this argument, petitioner cited to the trial court's oral ruling issued on March 4, 2004. However, the trial court's ruling did not indicate that the hearings would not cover the issue of whether the gun and other physical evidence would be suppressed. In fact, petitioner appears to acknowledge that the stipulation setting the suppression hearing indicated that the hearing *would* cover all items of physical evidence. (*Id.*) Instead, the oral decision—which was issued *after* the conclusion of the suppression hearing—was based upon the trial court's conclusion that, ultimately, the gun was not suppressible because it was not recovered from either petitioner or his co-defendant. This oral ruling did not, as petitioner contends, "vacate" an order for the suppression hearing. Indeed, such an argument is nonsensical insofar as the court's ruling was issued *after* the suppression hearing had already been conducted. To the extent that petitioner's argument is based upon counsel's failure to object to the trial court's ruling, for the reasons already stated *supra*, the Court finds that trial counsel's failure to object to March 4, 2004 ruling was not objectively unreasonable and did not constitute ineffective assistance of counsel. Thus, the Court finds that counsel's conduct did not fall outside the bounds of reasonable professional representation under *Strickland.*[7]

---

[7] The Court also notes that the stipulation that petitioner refers to apparently only indicated that

In any event, even if counsel should have objected to the trial court's ruling that the gun was not suppressible or should have made some additional motion to suppress, petitioner has failed to demonstrate that he was prejudiced by counsel's alleged error. Specifically, given the weight of the evidence presented against him at trial, petitioner cannot show there is a reasonable probability that if the gun had been suppressed the verdict at trial would have been different. For example, two eyewitnesses identified petitioner as a participant in the crime, the housekeeper testified that Contreras held a gun to her head throughout the commission of the crime, the cab driver returned the proceeds from the crime, and the police found a discarded trail of items from the home leading to the location where the petitioner was apprehended. Thus, petitioner has failed to show that he was prejudiced by the inclusion of the gun.

Accordingly, this Court cannot conclude that the Appellate Division's finding that petitioner received effective assistance of counsel was contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts. Petitioner's application for habeas relief on this ground is denied.

### (3) Failure to Preserve for Appeal that his Sentence was Harsh, Vindictive, and Excessive

Petitioner argues that trial counsel was ineffective because he failed to object to petitioner's sentence as harsh, vindictive,

and excessive and, therefore, failed to preserve the issue for appeal. As discussed below, the Court finds that this issue is without merit.

Despite trial counsel's failure to object to petitioner's sentence at the time of sentencing, the Appellate Division nonetheless reviewed the claim in the interest of justice and reduced petitioner's sentence from twenty-five years to fifteen years. *Simmons*, 815 N.Y.S.2d at 485. Thus, even assuming *arguendo* that trial counsel's failure to preserve the claim was deficient performance, petitioner cannot demonstrate that he was prejudiced by counsel's error since this claim nevertheless was reviewed by the appellate court and petitioner's sentence ultimately was modified. Therefore, petitioner has failed to satisfy the *Strickland* standard and his claim on this ground must be denied.

### b. Petitioner's Sentence, as Modified by the Appellate Division, Was Not Harsh, Vindictive, and Excessive

Petitioner also claims that his sentence was harsh, vindictive, and excessive and was imposed in retaliation for his decision to go to trial. As set forth below, the Court finds that this claim is without merit.

The Sixth Amendment guarantees the right to a trial by jury, and a state may not penalize a person for exercising a right guaranteed under the Constitution. *See Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort.").

In his direct appeal and his Section 440.10 motion, petitioner argued that the trial court—which was originally willing to accept a sentence of eight years for

---

petitioner wished to move to suppress certain items and set a hearing on the motion—it did not, as petitioner contends, guarantee him standing to suppress all of the evidence he challenged.

petitioner if petitioner pled guilty—punished petitioner for exercising his right to go to trial and consequently sentenced petitioner to twenty-five years' imprisonment. In support of this argument, petitioner pointed to the following statement made by the trial court at the conclusion of the suppression hearing:

> It is time to make the decision, Mr. Washington [petitioner], one way or the other. I told your lawyer this morning and I am telling you now, at this moment, I will go along with the eight years. I am inclined not to do that after what I have heard. I just want you to know that if you don't take it right this minute, I am not mentioning this in any way to threaten you, but I wanted you to know, unequivocally, that what I have told your lawyer is—we will not have any further plea discussions, but I am not going to participate any more. I am ready to try this case in March. If you lose at trial, you will get three times that after trial. That is just a fact. That is not a threat. If you think you can beat this case, go ahead. I think I have been way too reasonable and I am sorry I participated in all these prior conversations, based on that, I am willing to go along with it now. But not five minutes from now. Because we are going to call that witness and that is it. Then I will not participate any further.

(Hr. at 153-54.) Petitioner also noted that, at sentencing, the trial court stated: "From day one, I warned both defendants of the consequences of how seriously I would take this case. Mr. Contreras chose to take a plea and he's been on his way. This defendant chose to go to trial and put the victims through the additional trauma of that and

now had been convicted." (S.[8] at 7-8.) Accordingly, petitioner argued that the sentence imposed on petitioner was vindictive, harsh, and excessive, and was imposed in violation of his Sixth Amendment rights. (App. Br. 30-31.)

The Appellate Division agreed with petitioner and held that "[u]nder the circumstances, the sentence of 25 years' imprisonment raises the inference that the defendant was penalized for exercising his right to a jury trial." *Simmons*, 815 N.Y.S.2d at 485. Accordingly, the Appellate Division reduced petitioner's sentence from twenty-five years to a determinate term of fifteen years' imprisonment. *Id.* Nevertheless, petitioner persists in arguing that his sentence is harsh, excessive, and vindictive. The Court disagrees. As an initial matter, petitioner's arguments reference only the *trial* court's statements; he says nothing to indicate that the Appellate Division's modified sentence—which is the sentence petitioner is currently serving—is vindictive. Indeed, it is undisputed at this point that the trial court's actions gave an appearance of vindictiveness, as indicated by the Appellate Division's decision to reduce petitioner's sentence by ten years. Thus, petitioner's arguments regarding the sentence imposed by the trial court are inapposite to the Court's decision here, given that the sentence originally imposed by trial court has already been vacated by the Appellate Division on direct appeal.

Moreover, to the extent that petitioner is arguing that his sentence should have been lower than that of his allegedly "more culpable" co-defendant, and that his modified sentence—which sentences him to

---

[8] "S." refers to the transcript of petitioner's original sentencing on July 20, 2004.

the same length of imprisonment as Contreras—is vindictive, harsh, and excessive, the Court rejects this argument. First, as already indicated, petitioner has presented no facts whatsoever to indicate that the Appellate Division's decision to sentence petitioner to the same length of time as his co-defendant was made in an attempt to punish petitioner for exercising his constitutional right to trial. Without any evidence or indication to the contrary, the Court cannot conclude that the Appellate Division was acting in a vindictive manner in re-sentencing petitioner, particularly in light of the fact that the Appellate Division took no part in the original plea negotiations or sentence and opted to reduce petitioner's sentence on direct appeal. Second, any argument that the current sentence is harsh and excessive is also without merit. An excessive sentence claim is not grounds for habeas relief if it is well within the statutory range. *See White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (holding there is no constitutional issue when the sentence is within the prescribed statutory range); *Alfini v. Lord*, 245 F. Supp. 2d 493, 502 (E.D.N.Y. 2003) ("It is well settled that an excessive sentence claim may not be raised as grounds for habeas corpus relief if the sentence is within the range prescribed by state law." (collecting cases)); *McCalvin v. Senkowski*, 160 F. Supp. 2d 586, 589 (S.D.N.Y. 2001) ("Sentencing decisions are not cognizable on habeas corpus review unless the sentence imposed falls outside the range prescribed by state law."); *Thomas v. Senkowski*, 968 F. Supp. 953, 956 (S.D.N.Y. 1997) (dismissing excessive sentence claim where the petitioner's sentence fell within the range prescribed by state law). In the instant case, for his conviction of Burglary in the First Degree, petitioner faced a possible jail sentence of twenty-five years. *See* N.Y. Penal Law § 70.02(3). Thus, petitioner's sentence of fifteen years is well-within the authorized range. Accordingly, petitioner has failed to show that the Appellate Division's sentencing decision was contrary to, or involved an unreasonable application of federal law, and petitioner's claim regarding his sentence is rejected on the merits.

* * *

In sum, having carefully analyzed all of petitioner's claims, the Court concludes that, even if the petition was timely, the state court decisions challenged by petitioner were neither contrary to, nor an unreasonable application of, clearly established federal law, nor were they based on an unreasonable determination of the facts. Accordingly, the petition must be denied as time-barred and lacking merit.

### III. CONCLUSION

For the reasons set forth herein, the Court finds that the petition is untimely and that there is no basis for equitable tolling. Accordingly, the petition for a writ of habeas corpus must be dismissed as time-barred. Moreover, having analyzed the merits in an abundance of caution, the Court finds that petitioner has demonstrated no basis for relief under 28 U.S.C. § 2254 and, thus, even if the petition were timely, it would nonetheless have to be dismissed as meritless. Therefore, the petition is denied in its entirety. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close the case.


SO ORDERED.


_____
JOSEPH F. BIANCO
United States District Judge

Dated: May 26, 2011
Central Islip, New York

*** 

Petitioner is proceeding *pro se*. Respondent is represented by Douglas R. Noll and Laurie Kathleen Gibbons, Assistant District Attorneys, Nassau County District Attorney's Office, 262 Old Country Road, Mineola, NY 11501.